IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>vs.<br><br>JERREMY ALLEN MALLOY,<br><br>    Defendant. | CR 24-145-BLG-SPW<br><br><br><br><br>ORDER |

Before the Court is Defendant Jerremy Allen Malloy's Motion to Suppress. (Doc. 21). Malloy is charged with conspiracy to possess with the intent to distribute methamphetamine under 21 U.S.C § 846 and possession with the intent to distribute methamphetamine under 21 U.S.C. § 841(a)(1). (Doc. 1). Malloy seeks to suppress the evidence obtained from the search of his vehicle on June 12, 2024 that resulted in his current charges. (Doc. 22 at 12). Malloy argues that the evidence seized must be suppressed because his traffic stop was improperly prolonged in violation of the Fourth Amendment. (*Id.* at 1). A suppression hearing was held on August 1, 2025 where Billings Police Department ("BPD") Detective Hallam, BPD Officer Catlin, and Montana State Probation and Parole Officer Kenat testified. (Doc. 34). The Court finds the material facts are not disputed based on the parties' briefing, the officers' reports, body cam videos, and the officers' testimony.

1

For the reasons stated below, the Court grants the motion.

## I.    Background

On June 12, 2024, Detective Hallam arrested an individual who told him that a substantial amount of methamphetamine was being trafficked at 929 Custer Avenue. (Doc. 22-1 at 4). Later that day, Detective Hallam conducted surveillance at 929 Custer Avenue for approximately 30 to 45 minutes. He observed three to four individuals at the address, including Malloy. Malloy pulled up to the residence in a blue Chrysler 300 and exited the vehicle with a black shoulder bag over his shoulder. (*Id.*). Malloy walked towards the residence and met another individual in the front yard. The two walked to Malloy's vehicle and rummaged through the trunk. (*Id.*). Shortly after, Malloy placed the black shoulder bag in his car and drove away. (*Id.*). According to Detective Hallam's testimony, Malloy stayed at the residence for about 15 to 20 minutes. The other individuals who arrived at the residence went inside and quickly left after two to three minutes.

BPD Officers Catlin and Beechie joined in surveilling the residence. (*Id.*). When Malloy left the residence Officer Catlin followed him. (Doc. 22-1 at 8). Officer Catlin observed Malloy fail to use his turn signal twice and initiated a traffic stop. (*Id.*). During the traffic stop, Malloy told Officer Catlin that he was coming from his brother's house and was on probation for "meth." (Doc. 29-2 at

2:04). Officer Catlin saw the black shoulder bag on the passenger floorboard, returned to his vehicle, and contacted Officer Kenat. (Doc. 22-1 at 8).

Officer Kenat informed Officer Catlin that Malloy had missed a meeting with his probation officer on May 14 because he was recovering from surgery. (Doc. 29-2 at 7:48). Officer Catlin told Officer Kenat that they followed Malloy from an address suspected of drug trafficking. (*Id.* at 8:28). Based on this information, Officer Kenat requested Officer Catlin conduct a probationary search of the vehicle. (*Id.* at 8:49).

Officer Catlin reapproached the vehicle and informed Malloy that probation had requested a search of the vehicle. (*Id.* at 11:15). Malloy stepped out of the vehicle, rolled up the windows, and locked the car. (*Id.* at 11:28–37). Malloy told the officers he would not open the car because it was his mother's. (*Id.* at 12:40). The officers then handcuffed Malloy and Mirandized him. (*Id.* at 12:50–14:25). Officer Catlin asked Malloy if there were any drugs in the car, to which he responded, "There may be." (*Id.* at 15:04). Malloy told Officer Catlin that the black shoulder bag belonged to his friend, and he was unaware of its contents. (*Id.* at 15:31–42).

Detective Hallam arrived at the scene and began questioning Malloy. (*Id.* at 16:20). Malloy told Detective Hallam that the black shoulder bag probably contained drugs and reiterated that it was his friend's bag. (*Id.* at 17:25–40).

Detective Hallam approached the vehicle to view the bag; he opened the passenger door and removed a pair of shorts covering the black shoulder bag. (*Id.* at 18:32–39). Detective Hallam told Malloy he saw him with the same bag at 929 Custer Avenue, that the bag never left his shoulder, and that he watched him put the bag in his car as the sole occupant. (*Id.* at 20:32–52). At this point, Malloy admitted that there were drugs in the car and estimated that there was a pound of methamphetamine. (*Id.* at 21:58–22:05). Officers then searched the black shoulder bag from the car and found two bags containing a total of 26.7 ounces of methamphetamine, a scale, pipes, and empty baggies. (Doc. 22-1 at 9; Doc. 29-2 at 28:02–39).

## II.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999). Probationers have a diminished privacy interest under the Fourth Amendment and

4

an officer only requires reasonable suspicion to conduct a probationary search. *United States v. Knights*, 534 U.S. 112, 120 (2001).

If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result of the unconstitutional actions of law enforcement must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

## III.    Discussion

In his Motion to Suppress, Malloy argues that: (1) Officer Catlin illegally prolonged the traffic stop without basis; (2) law enforcement lacked the reasonable suspicion necessary to justify the warrantless probation search; and (3) the search cannot be justified as incident to an arrest. (Doc. 22 at 7–10). In response, the Government argues that prolonging the stop was reasonable because as the stop progressed, Officer Catlin developed reasonable suspicion that Malloy violated his probationary conditions and was engaged in illegal drug activity. (Doc. 28 at 10). Further, whether Officer Kenat had reasonable suspicion to order a probation search is irrelevant because, as the stop developed, Malloy provided significant additional evidence that he had methamphetamine in the car. (*Id.* at 13).

Case 1:24-cr-00145-SPW    Document 37    Filed 08/18/25    Page 6 of 16


## A.    Traffic Stop

Under the Fourth Amendment, a seizure for a traffic stop is a "relatively brief encounter," that is more analogous to a *Terry* stop than to a formal arrest. *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (citations omitted). "When the police pull someone over for a traffic violation the officer can obviously investigate that traffic infraction." *United States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). However, a traffic stop "exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 354–55. The tolerable duration of a stop is determined by the purpose of the stop. *Id.* at 348 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois*, 543 U.S. at 407. "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez*, 575 U.S. at 349.

"When stopping an individual for a minor traffic violation, 'an officer's mission includes ordinary inquiries incident to the traffic stop.'" *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (citations omitted). These tasks involve "checking the driver's license, determining whether there are outstanding warrants

6

against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 349. Notably, the *Rodriguez* court held that measures aimed at "detecting evidence of ordinary criminal wrongdoing" and "[o]n-scene investigation into other crimes ... detours from the mission of the traffic stop." *Id.* at 355–56. Thus, a traffic stop becomes unlawful when officers engage in unrelated actions to the mission of the traffic stop that "measurably extend the duration of the stop," *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), unless these actions are supported by independent reasonable suspicion, *United States v. Landeros*, 913 F.3d 862, 867–68 (9th Cir. 2019).

Here, Officer Catlin asked Malloy for his driver's license, registration, and proof of insurance, all tasks related to the mission of a traffic stop for a minor traffic violation. Officer Catlin then asked Malloy about his probationary status. After learning Malloy was on probation for a meth related offense, Officer Catlin contacted Officer Kenat and sought authorization for a probationary search. Ultimately, Officer Kenat ordered a search. In all, Officer Catlins conversation with Officer Kenat lasted approximately two and a half minutes.

The Court will first determine whether Officer Catlin's inquires into Malloy's probationary status lawfully prolonged the stop, and if not, whether the prolonged stop was independently justified by reasonable suspicion.

1.    *"Mission" of the Stop*

Neither the Ninth Circuit nor the Supreme Court has definitively determined whether questions about a suspect's probationary status during a traffic stop relate to the "mission" of the stop. The Supreme Court has found that officer safety "stems from the mission of the stop itself" because "[t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356. Based on this holding, the Ninth Circuit has recognized that criminal history checks "stem from the mission of the stop itself" because knowledge of an individual's past criminal convictions is relevant to officer safety. *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022). In contrast, the Ninth Circuit has held that "felon registration checks" are unrelated to the mission of the stop. A felon registration check is a computer check to see if a person is properly registered as a felon in accordance with state law. Such checks only occur after law enforcement knows the person they pulled over is a felon. "Whether a felon is properly registered is less related to officer safety than whether someone is a felon at all." *Id.* Therefore, felon registration checks are "a measure aimed at detecting evidence of ordinary criminal wrongdoing," rather than a task that stems from the mission of the traffic stop. *Rodriguez*, 575 U.S. at 355–56.

8

In keeping with this logic, the Ninth Circuit has held that questions about an individual's parole status is a negligibly burdensome measure that reasonably relates to an officer's safety. *Ramirez*, 98 F.4th at 1144. "In assessing potential risks involved in a traffic stop, it is useful for a police officer to know if the person remains on parole because a parolee has committed a crime serious enough to have merited prison time." *Id.* Questions about an individual's parole status are akin to running a criminal history check, as they provide the officer with notice that the individual they are interacting with has a criminal history. *See Hylton*, 30 F.4th at 848.

The Ninth Circuit left open the question of whether asking about a person's probation status during a traffic stop runs afoul of the Fourth Amendment. However, the Court finds that a person's status as a probationer relates to the mission of the traffic stop because, like an individual's parole status, it concerns officer safety. "The very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law." *United States v. Knights*, 534 U.S. 112, 119–20 (2001). In fact, "[t]he recidivism rate of probationers is significantly higher than the general crime rate." *Id.* at 120. An inquiry into probation status is akin to police officers running a criminal history check, as it provides the officer with notice that the individual has been convicted of a crime and is more likely to commit a crime in the future.

On the other hand, contacting a suspect's probation officer to ask about a probationary search falls outside the mission of the traffic stop. This inquiry is "a measure aimed at detecting evidence of ordinary criminal wrongdoing," rather than a task that stems from the mission of the traffic stop. *Rodriguez*, 575 U.S. at 355–56. Such questions are more akin to a felony registration check than a criminal history background check. Similar to a felon registration check, where law enforcement determines whether the individual is complying with state law, inquiries into whether a probation officer will authorize a probation search are unrelated to officer safety and instead concern evidence of ordinary criminal wrongdoing.

At the hearing, Officer Catlin testified that his phone call with Officer Kenat occurred simultaneously with ordinary tasks related to Malloy's traffic violation. However, body camera footage from Officer Catlin contradicts his assertion. Officer Catlin exits the car to conduct a probationary search immediately after his phone call with Officer Kenat ends. (Doc. 29-2 at 9:29). Based on the body camera footage, the Court can only conclude that all of the ordinary tasks related to the "mission of the traffic stop" were completed prior to the end of the phone call with Officer Kenat. Thus, the call with Officer Kenat prolonged the stop by some amount of time, although the exact length of the extension cannot be conclusively determined. There is no *de minimis* exception when law enforcement prolongs a

stop. Any time added unrelated to the mission of the traffic stop is unlawful. *See Landeros*, 913 F.3d at 867 (recognizing that a traffic stop is unlawfully prolonged where "any time" is "added"); *United States v. Clark*, 902 F.3d 404, 409–410 (3d Cir. 2018) ("The Supreme Court in *Rodriguez* directs our attention to the mission of the traffic stop to determine whether it is impermissibly lengthened … There is no *de minimis* exception to this rule"); *United States v. Baker*, 108 F.4th 1241, 1245 (10th Cir. 2024) ("even *de minimis* delays can unreasonably prolong a traffic stop.").

In sum, the Court finds that while a question about a suspect's probationary status is lawful, requesting authorization to conduct a probationary search falls outside the mission of the traffic stop. Thus, because Officer Catlin's phone call with probation continued after completing all ordinary tasks related to the mission, he unlawfully prolonged the traffic stop.

### 2.    *Reasonable Suspicion*

Officer Catlin could not prolong the stop by calling Officer Kenat without first developing reasonable suspicion that Malloy was involved in criminal activity.

If a task is not related to the mission of a traffic stop and adds any time, independent reasonable suspicion is required. *Landeros*, 913 F.3d at 867. "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (quoting *United States v. Cortez*, 449

11

U.S. 411, 417–18 (1981)).  Reasonable suspicion necessary to justify a prolonging of a stop under the Fourth Amendment "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).  The Court examines the "totality of the circumstances" to determine whether a detaining officer has a "particularized and objective basis" for suspecting criminal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).

Malloy argues that Officer Catlin lacked any particularized suspicion of criminal activity when he prolonged the stop.  (Doc. 22 at 8).  In response, the Government contends that Officer Catlin developed reasonable suspicion based on Malloy's earlier presence at 929 Custer Avenue, in combination with his nervous behavior during the traffic stop, and probationary status.  (Doc. 28 at 11–12).

First, at least some weight is afforded to Officer Catlin's knowledge of Malloy's probationary status.  Because probationers are more likely than the typical citizen to violate the law, they do not enjoy "the absolute liberty to which every citizen is entitled." *Knights*, 534 U.S. at 120–21 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).  The Government has an increased interest in "protecting

12

potential victims of criminal enterprise" when interacting with probationers. *Id.* at 121. However, the remaining two facts add little to the reasonable suspicion calculation.

First, nervousness alone does not establish reasonable suspicion or justify a prolonged detention. "Encounters with police officers are necessarily stressful for law abiders and criminals alike … nervousness during a traffic stop … in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity." *United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001) *amended*, 279 F.3d 1062 (9th Cir. 2002), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005). The Government has failed to show that Malloy's nervousness was more pronounced than what would be expected during a typical police encounter. *See United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) ("The government did not show that Mr. Salzano exhibited signs of nervousness beyond those normally anticipated during a citizen-police encounter.").

Second, law enforcement never confirmed that individuals at 929 Custer Avenue were dealing narcotics, and Malloy's actions at the address did not create any particularized suspicion of criminal wrongdoing. BPD officers suspected, but never confirmed, that 929 Custer Avenue was a drug trafficking hub before pulling over Malloy. Detective Hallam observed the residence for 30 to 45 minutes and

witnessed three to four people enter the address and leave. During this time, Detective Hallam never saw an exchange of drugs for money.

Even if law enforcement had confirmed drug trafficking was occurring, mere proximity to the scene of illegal drug transactions is insufficient to establish participation in criminal activity unless accompanied by other evidence that supports such an inference. *United States v. Garcia-Guizar*, 160 F.3d 511, 517 (9th Cir. 1998). Here, no evidence supports such an inference. Detective Hallam testified that, besides Malloy, every individual observed was at the address for a maximum of three minutes. He described this as a "turn and burn" pattern indicative of a drug trafficking operation. In contrast, Malloy was at the residence for 15 to 20 minutes. He spent all his time conversing in the front yard and hanging around his vehicle with an unknown resident. Malloy never entered the residence and the individual he was conversing with did not enter and come back out of the residence. Further, although Malloy had his black shoulder bag with him the entire time he was at 929 Custer Avenue, Detective Hallam did not witness him take anything out or put anything inside the bag. Malloy's behavior was consistent with innocent conduct and adds little to the reasonable suspicion determination.

In sum, Malloy's probationary status added some weight to the reasonable suspicion calculation because probationers have a higher propensity to commit crimes than the average citizen. However, the remaining facts known to law

14

enforcement did not provide a particularized and objective basis for suspecting criminal wrongdoing. The Court finds that Officer Catlin prolonged the traffic stop based on a hunch rather than reasonable suspicion. Namely, that because Malloy was leaving a residence suspected of drug trafficking, he was also involved in the narcotics trade.

The Court concludes that Officer Catlin unlawfully prolonged the stop when he called Officer Kenat to inquire about a probation search. Furthermore, the prolonged stop was not independently justified by reasonable suspicion. The subsequent search of his car was, therefore, tainted by illegality. *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017). Thus, the evidence discovered should be suppressed as fruit of the poisonous tree. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007).

///

///

///

///

///

///

///

///

15

## IV.    Conclusion

For these reasons, the Court finds law enforcement violated Malloy's Fourth Amendment rights when they unlawfully prolonged his traffic stop beyond the mission of the stop and subsequently conducted a search of his vehicle.   All of the evidence obtained as a result of the search is inadmissible.

IT IS HEREBY ORDERED that Defendant Jerremy Allen Malloy's Motion to Suppress (Doc. 21) is GRANTED.

DATED this ___18th___ day of August, 2025.

SUSAN P. WATTERS
United States District Judge